**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| LORENZO ALLEN THOMAS | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:21-CV-692-P |
| | § | |
| MICHAEL CAGEL, ET AL. | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION REGARDING**
**DEFENDANTS' MOTIONS TO DISMISS UNDER RULE 12(c)**

Pending before the Court are two motions filed on April 22, 2022: Defendant David Hafer ("Hafer")'s Second Motion and Brief to Dismiss [doc. 31] and Defendant Michael Cagel[1] ("Cagel")'s Motion to Dismiss under Rule 12(c) [doc. 32]. Having carefully considered *pro se* Plaintiff Lorenzo Allen Thomas ("Thomas")'s Original Complaint ("Complaint") [doc. 1], Answers to the Court's Questionnaire ("Pl.'s Answers to Quest.") [doc. 9], Memorandum in Support of His Reply to Defendants['] Qualified Immunity Defense ("Rule 7(a) Reply") [doc. 30], Defendants' motions, and other relevant pleadings, the Court **RECOMMENDS** that Defendant Hafer and Defendant Cagel's motions be **GRANTED**.

## I.    FACTUAL BACKGROUND[2]

"In 2019[,] Thomas began protesting the mistreatment of the homeless living in the downtown Fort Worth area by the police and businesses in the area." (Plaintiff's Complaint ("Pl.'s

---

[1] The Court notes that Defendant Cagel, in his motion, spells his name "Cagle." Because Plaintiff misspelled Defendant Cagel's name in the heading of Plaintiff's Complaint, it is misspelled on the docket sheet. In an effort to be consistent, the Court will use his name as spelled on the docket sheet--Cagel.

[2] Because the Court is considering a Motion for Judgment on the Pleadings, the Court must "accept as true all well-pleaded facts contained in the plaintiff's complaint and view them in the light most favorable to the plaintiff." *See Cinemark Holdings, Inc. v. Factor Mut. Ins. Co.*, 500 F. Supp. 3d 565, 568 (E.D. Tex. 2021). Thus, the facts are taken as true as alleged by Thomas in his Complaint, Answers to the Court's Questionnaire, and Rule 7(a) Reply.

Compl.") at 7; *see* Plaintiff's Rule 7(a) Reply ("Pl.'s Reply") at 2.) "Thomas and other homeless people would gather near the public library throughout the day" because the "library was public property and people that are homeless could avoid trespassing or loitering complaints." (Pl.'s Answers to Quest.) at 2.) Defendants Cagel and Defendant Hafer were assigned to the "Police Bike Unit in the downtown area" and "responded to several calls to the library while Thomas was living downtown in 2019." (Pl.'s Answers to Quest. at 2.) "Thomas began noticing that the officers assigned to the Bike unit[ ] disapproved of the gathering at the public library by the homeless and made several arrest[s] and [gave] citations to the homeless in attempt to stop the gathering and push the homeless back towards the Lancaster area known as the Hub for the homeless." (Pl.'s Answers to Quest. at 2; *see* Pl.'s Answers to Quest. at 4.) In 2019, Thomas began filming the officers and would "speak out on incidents that he felt the officers were violating the induvial [sic] rights or performing some kind of misconduct." (Pl.'s Answers to Quest. at 2; *see* Pl.'s Answers to Quest. at 2-4.) Thomas had multiple confrontations with Defendants Hafer and Cagel and the "reputation Thomas gained because of the filming and protesting, built animosity between Thomas, Hafer,[3] Cagel[,][4] and the FWPD bike unit." (Pl.'s Answers to Quest. at 3 (footnotes added); *see* Pl.'s Answers to Quest. at 4, 7, 10.)

---

[3] Thomas claims that, a few weeks prior to the August 15, 2019 "unlawful arrest," Thomas was approached by Defendant Hafer and accused of and eventually arrested for violating a city ordinance for sitting on the sidewalk. (Pl.'s Answers to Quest. at 4; *see* Pl.'s Reply at 2-3.) (In his Answers to Questionnaire, Thomas appears to mistakenly state that this arrest for sitting on the sidewalk also happened on August 15, 2019. (Pl.'s Answers to Question. at 10).) During this incident, Thomas alleges that Defendant Hafer "and other officers tried to prevent Thomas and his girlfriend from filming the incident" and that Defendant Hafer "arrested Thomas's girlfriend" for "refus[ing] to give the phone to the officers that were arresting Thomas." (Pl.'s Answers to Quest. at 4; *see* Pl.'s Answers to Quest. at 10; Pl.'s Reply at 3.) Thomas claims that the charges against her were dismissed. (Pl.'s Answers to Quest. at 10; Pl.'s Reply at 3.)

[4] Thomas claims that "on several incidents where he witnessed officer misconduct defendant Cagel was normally called to the scene." (Pl.'s Answers to Quest. at 7.) Thomas also claims that "Cagel in 2019 before the August arrest, conspired with a worker at the library alleging that Thomas was panhandling outside the library." (Pl.'s

2

On August 15, 2019, Thomas was standing outside the library when he was approached by Defendant Cagel, Defendant Hafer and another Fort Worth Police officer, Aaron Garcia ("Officer Garcia").[5] (Pl.'s Compl. at 7; *see* Pl.'s Answers to Quest. at 1; Pl.'s Reply at 3.) The officers "claimed they were there to determine whether Mr. Thomas had a[n] out-of-state warrant" for marijuana charges.[6] (Pl.'s Compl. at 7; *see* Pl.'s Answers to Quest. at 1, 4., 7-8; Pl.'s Reply at 3-4.) Thomas' girlfriend and another homeless woman were recording the entire events and complaining about the arrest of Thomas. (Pl.'s Compl. at 7; *see* Pl.'s Reply at 3-4.) Defendant Cagel then stated, "Keep it up you will be put in this too." (Pl.'s Compl. at 7.) After twenty-seven minutes of being detained, the officers arrested Thomas. (Pl.'s Compl. at 8; *see* Pl.'s Reply at 17.)[7] Thomas does not allege that his girlfriend was also arrested at this time.[8] (Pl.'s Compl. at 7-8.)

---

Answers to Quest. at 7; *see* Pl.'s Reply at 3.) Thomas states that he was arrested even though "security for the library tried to inform defendant Cagel that Thomas had in fact not been panhandling." (Pl.'s Reply at 3.)

[5] Thomas did not list Officer Garcia as a Defendant in the style of the lawsuit in his Complaint. However, to the extent that Thomas intended to include Officer Garcia as a defendant in the lawsuit, Officer Garcia would also be entitled to qualified immunity for the same reasons as Defendant Hafer.

[6] Thomas claims that the officers were aware from prior interactions that Thomas had an out-of-state warrant issued in Arkansas but that officials in Arkansas did not have any intention of extraditing Thomas. (Pl.'s Compl. at 7; *see* Pl.'s Answers to Quest. at 3-4; Pl.'s Reply at 3-4; Pl.'s Compl. at 3-4.) Thomas alleges that the officers "knew that day that their action in detaining Thomas was illegal because of the fabricated story that they were sent to investigate a warrant." (Pl.'s Answers to Quest. at 3-4; *see* Pl.'s Reply at 3-4.) Thomas claims that "Hafer, Cagel, and Garcia orchestrated the August 2019 arrest in an attempt to intimidate, harass, and force Thomas to stop filming, writing complaints and to force Thomas to relocate from living downtown and return to the Lancaster area which is the hub for the homeless." (Pl.'s Answers to Quest. at 5; *see* Pl.'s Reply at 3-5.)

[7] Thomas also states that "the violations of his constitutional rights by Defendants was not the result of official policies or customs of the City of Fort Worth or FWPD, but rather the result of the Defendants acting in the individual capacity" and that such actions were "intentionally and knowingly." (Pl.'s Answers to Quest. at 6-7.) Thomas further claims that "the defendants came up with the August 2019 arrest on their own" and their actions "were a result of the FWPD failure to properly investigate citizens' complaints involving police misconduct, which allowed the officer not to fear discipline for police misconduct." (Pl.'s Answers to Quest. at 6-7; *see* Pl.'s Reply at 15-16.) Thomas alleges that "the defendants were attempting to kidnap a citizen without any authority, probable cause and without FWPD or the City of Fort Worth knowing." (Pl.'s Answers to Quest. at 11.) Thomas argues that he "was put in jail multiple times for protesting police officers misconduct and making complaints about such misconduct." (Pl.'s Reply at 1.)

[8] Thomas does allege that he and his girlfriend were both arrested a few days earlier. (Pl.'s Answers to Quest. at 10.)

3

After his arrest, the three officers took Thomas to a "police substation."[9] (Pl.'s Compl. at 8; *see* Pl.'s Answers to Quest. at 1.) At the police substation, Defendant Cagel ordered Defendant Hafer to change Thomas' handcuffs and place him in a different patrol car. (Pl.'s Compl. at 8; *see* Pl.'s Reply at 19.) "While doing this, Cagel kept winking and smirking at Mr. Thomas and continued to state that 'they' were taking Thomas to Arkansa[s] themselves." (Pl.'s Compl. at 8; *see* Pl.'s Answers to Quest. at 8.[10]) Thomas was then placed in a transport vehicle with Defendant Hafer and Officer Garcia. (Pl.'s Answers to Quest. at 1.) Because Thomas "feared that he was at a substantial risk of being harmed or a substantial risk of loss of life," Thomas "began hitting his head on the cage in an attempt to cause a scene so the bystanders would witness their actions and possibly stop their illegal actions" as Defendant Hafer and Officer Garcia attempted to drive away. (Pl.'s Compl. at 8; Pl.'s Answers to Quest. at 1.) Defendant Hafer stopped the patrol car, got in the back seat with Thomas, and held Thomas in a "bear hug hold." (Pl.'s Compl. at 8.) Defendant Hafer then "tied Mr. Thomas's legs together and attempted to drive off. (Pl.'s Compl. at 8.) When Thomas "continued to create a scene," Defendant Cagel "instructed Hafer that[,] if Mr. Thomas continued[,] to spray him." (Pl.'s Compl. at 8; *see* Pl.'s Answers to Quest. at 1.) Thomas claims that, because he was fearing risk of harm or loss of life, he "continued to create a scene" by "hitting

---

[9] Thomas states: "Although the arrest took place in front of the public library; which was 2 streets behind the jail, Mr. Thomas was taken at least 10 blocks from the jail." (Pl.'s Compl. at 8; *see* Pl.'s Answers to Quest. at 8.)

[10] "Cagel is the sergeant that told Thomas that he was having Hafer and Garcia transport Thomas to Arkansas. Cagel was going to have Hafer and Garcia transport Thomas within the 50-mile radius that the out of state agency would agree to arrest Thomas, without the FWPD knowledge or the Texas Court system or an extradition order." (Pl.'s Answers to Quest. at 8.)

his head on the cage."[11]  (Pl.'s Compl. at 8-9; Pl.'s Answers to Quest. at 1-2.)  Thereafter, Defendant Hafer "stopped the patrol car, opened the rear door and sprayed Thomas in the face with mace."[12]  (Pl.'s Compl. at 9; *see* Pl.'s Answers to Quest. at 2.)

At this point, "[D]efendant[s] Hafer and Garcia violently jerked Mr. Thomas from the patrol car, but were unsuccessful due to Thomas's feet being tied and anchored to the floorboard of the patrol car."  (Pl.'s Compl. at 9.)  "Once Mr. Thomas' feet were free, due to asthma Thomas began to have complications which required the use of CPR." [13] (Pl.'s Compl. at 9; *see* Pl.'s Compl at 3; Pl.'s Answers to Quest. at 2, 6.)  After reviving Thomas, the officers transported Thomas to "John Peter Smith Medical Hospital."  (Pl.'s Compl. at 9; *see* Pl.'s Answers to Quest. at 2.) Thomas claims he was subject to pain and suffering as the pepper spray caused burning to his "eyes, face and testicles."  (Pl.'s Compl. at 3-4, 14.)

"[W]hile at the hospital, [Thomas] remember[s] officers [lying and] stating that nothing was wrong with him."  (Pl.'s Compl. at 9; *see* Pl.'s Answers to Quest. at 6.)  At the hospital "a visual examination was conducted, however, [Thomas] wasn't offered decontamination after the use of chemical agents but instead cleared to be transported to the county jail."  (Pl.'s Compl. at 3.)  While at the hospital, Defendant "Hafer lied to the hospital staff about CPR being performed

---

[11] In his Rule 7(a) Reply, Thomas also admits "to hitting his head on the plex[i] glass divider when the officers would attempt to drive off to Arkansas."  (Pl.'s Reply at 5.)

[12] Thomas claims that he "was not resisting or harming himself when Hafer stopped the police car and opened the door and sprayed Thomas in the face with chemical agents" . . . "while he was in handcuffs and his feet were tied." (Pl.'s Answers to Quest. at 8; *see* Pl.'s Answers to Quest. at 11; Pl.'s Reply at 5.)  Thomas claims that "the use of force was not to prevent Thomas from harming himself, but instead out of irritation and frustration."  (Pl.'s Reply at 5.)  Thomas also claims that, during the arrest, he requested a supervisor be brought to the scene and Hafer "refused to call one claiming that there was already a supervisor there."  (Pl.'s Answers to Quest. at 8.)

[13] Thomas also states that his handcuffs were removed prior to CPR being performed.  (Pl.'s Answers to Quest. at 2.)

and gave Thomas a towel to wipe his face" before Thomas was transported to the jail.[14]  (Pl.'s

Answers to Quest. at 6.)

Thomas was then discharged from the hospital, arrested for resisting arrest, and transported

to the Tarrant County Jail.  (*Id.*)  "At the jail[,] Thomas was placed in mental health segregation

and wasn't provided a shower for 3 days nor was he seen by medical."  (Pl.'s Answers to Quest.

at 6; *see* Pl.'s Compl. at 3-4.)  As a result, Thomas "was forced to be in pain due to the chemical

agents and not being decontaminated."  (Pl.'s Answers to Quest. at 6; *see* Pl.'s Compl. at 3.)  "At

trial," the resisting arrest charges were dropped and Thomas was released.  (Pl.'s Compl. at 9; *see*

Pl.'s Answers to Quest. at 2, 8-9.)

Subsequently, Thomas moved to Waxahachie, where he lived and worked for

approximately six months.  (Pl.'s Compl. at 9; *see* Pl.'s Answers to Quest. at 5, 9.)  Thereafter, in

or around April 2020, Thomas and his girlfriend returned to Fort Worth as they were again

homeless.  (Pl.'s Compl. at 9; *see* Pl.'s Answers to Quest. at 5, 9.)  Approximately a week after

arriving back in Fort Worth, Thomas was walking under a railroad underpass downtown and

"noticed a police truck drive by him going the opposite direction."  (Pl.'s Compl. at 10; *see* Pl.'s

Answers to Quest. at 5, 9.)  When Thomas "peeked over his shoulder, he noticed the officer was

coming back his way."  (Pl.'s Compl. at 10; *see* Pl.'s Answers to Quest. at 5, 9.)  As the officer

reached the underpass, "he rolled his passenger window down and yelled 'Hey . . . .Lorenzo

Thomas?'"  (Pl.'s Compl. at 10; *see* Pl.'s Answers to Quest. at 5, 9.)  "When Thomas

acknowledged that he was in fact that person, at that point Thomas noticed it was Sgt. Cagel."

---

[14] Thomas also claims that "while at the hospital, he remembers officers stating that nothing was wrong with
him." (Pl.'s Compl. at 9.) Thomas also states, "Defendants told the medics and nurses at the hospital, 'he was only
sprayed with OC spray and only CPR was administered but only one chest compression was performed . . . .'" (Pl.'s
Compl. at 23.)

(Pl.'s Compl. at 10; *see* Pl.'s Answers to Quest. at 5.) Defendant Cagel then asked Thomas why he was back in Fort Worth. (Pl.'s Compl. at 10; *see* Pl.'s Answers to Quest. at 5, 9.) When Thomas explained that he lived in Fort Worth, "Sgt[.] Cagle exited the police truck and stated: 'Well [I] guess we're going to take another ride,' and told Thomas not to run." (Pl.'s Compl. at 10; *see* Pl.'s Answers to Quest. at 5, 9.)

Thomas, fearing what would happen, "took off running" in the direction of his "campsite in an attempt to reach his girlfriend and other people who could witness any misconduct." (Pl.'s Compl. at 10; *see* Pl.'s Answers to Quest. at 5.) When Thomas reached the campsite, his girlfriend was not there. (Pl.'s Compl. at 10.) Consequently, seeing "he had nowhere to go and he was surrounded, Thomas turned around, kneeled down with his hands up." (Pl.'s Compl. at 11.) Once apprehended, Thomas was taken back to Defendant Cagel's patrol car. (*Id.*) As Defendant Cagel opened the back of the cruiser, Defendant Cagel "sl[a]pped Thomas in the chest stating: 'Welcome back.'" (Pl.'s Compl. at 11.) Thomas requested medical treatment as he was being transported to Tarrant County Jail because "he was having chest pains after being slapped in the chest by Sgt[.] Cagel." (*Id.*) The officer transporting "him laughed and stated that they weren't playing that game."[15] (Pl.'s Compl. at 11.) "[T]he transport officers stated that the ambulance would be dispatched to the jail." (*Id.*) Thomas was transported to jail and charged with "evading arrest and railroad violation." (*Id.*)

Thomas filed suit against Defendants Hafer and Cagel on May 27, 2021, alleging claims against them both for: (1) excessive force; (2) unlawful arrest; (3) retaliatory arrest; and (4)

---

[15] Thomas stated that he "could only infer that the officer was talking about the pepper spray incident with Sgt. Cagel and Hafer, when the officer told nurses at the hospital that CPR was really [not] needed that Thomas was faking." (Pl.'s Compl. at 11.)

deliberate indifference.  In their motions to dismiss, Defendants Hafer and Cagel argue, *inter alia*, that all claims against them should be dismissed as they are entitled to qualified immunity.

## II.    LEGAL STANDARD AND ANALYSIS

Parties may move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). Rule 12(c) motions are "designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noted facts." *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312 (5th Cir. 2002). "A motion for judgment on the pleadings under Rule 12(c) is subject to the same standard as a motion to dismiss under Rule 12(b)(6)." *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 209 (5th Cir. 2009) (citations and internal quotations omitted).  Federal Rule of Civil Procedure ("Rule") 12(b)(6) authorizes the dismissal of a complaint that fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The Court must accept as true all well-pleaded, non-conclusory allegations in the complaint and liberally construe the complaint in favor of the plaintiff. *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999).

The plaintiff must, however, plead specific facts, not mere conclusory allegations, to avoid dismissal. *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992).  Indeed, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face," and his "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).  The Court need not credit bare conclusory allegations or "a formulaic recitation of the elements of a cause of action." *Id.* at 545.  Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

8

the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

Thomas seeks relief in this case under 42 U.S.C. § 1983 (*see* Pl.'s Compl. at 12-23), which "creates a private right of action for redressing the violation of federal law by those acting under color of state law." *Colson v. Grohman,* 174 F.3d 498, 504 n.2 (5th Cir. 1999) (citing *Migra v. Warren City Sch. Dist. Bd. of Educ.,* 465 U.S. 75, 82 (1984)). "Rather than creating substantive rights, § 1983 simply provides a remedy for the rights that it designates. Thus, an underlying constitutional or statutory violation is a predicate to liability under § 1983." *Harrington v. Harris,* 118 F.3d 359, 365 (5th Cir. 1997) (citations and internal quotation marks omitted) (quoting *Johnson v. Harris Cty., Flood Control Dist.,* 869 F.2d 1565, 1573 (5th Cir. 1989)).

As set forth above, Defendants seeks judgment on the pleadings on the basis that they are entitled to qualified immunity from Thomas' claims of multiple constitutional violations. "The doctrine of qualified immunity protects government officials from suit and liability for civil damages under § 1983 insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Byers v. Navarro Cty.,* No. 3:09-CV-1792-D, 2012 WL 677203, at *2 (N.D. Tex. Mar. 1, 2012) (citing *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) and *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)). This is an affirmative defense that balances the important interests of holding "public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson,* 555 U.S. at 231. Because an official is entitled to immunity from suit, not merely from liability, immunity questions should be resolved at the earliest possible stage in the litigation. *Hunter v. Bryant,* 502 U.S. 224, 227 (1991). Qualified immunity protects "all but the plainly incompetent or those who knowingly

9

violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). "When a defendant raises the defense of qualified immunity, the plaintiff bears the burden to negate the defense once it is properly raised." *Cano v. Vickery*, No. H-16-392, 2018 WL 4567169, at *3 (S.D. Tex. Sept. 24, 2018).[16]

The Supreme Court has developed a two-step inquiry for resolving government officials' qualified immunity claims: (1) whether the facts that the plaintiff has **alleged** (at the motion-to-dismiss or motion for judgment on the pleadings stage) or **shown** (at the summary-judgment stage) make out a violation of a constitutional or statutory right; and (2) whether the right at issue was "clearly established" at the time of the defendant's alleged misconduct. *Pearson*, 555 U.S. at 232 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Although the Supreme Court previously mandated that the two steps be resolved in sequence, in *Pearson v. Callahan*, it gave the lower courts permission to use discretion in deciding which of the two prongs to address first in light of the circumstances of the particular case. *Pearson*, 555 U.S. at 236 (rejecting the prior holding in *Saucier v. Katz*, that the analysis was a mandatory two-step sequence); *see also Lytle v. Bexar Cty., Tex.*, 560 F.3d 404, 409 (5th Cir. 2009). In conducting the inquiry under the first prong—whether the Plaintiff has alleged or shown a violation of a constitutional right—the Court is to "employ currently applicable constitutional standards." *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (en banc).

---

[16] The Court notes that Thomas, on May 13, 2022, filed a "Reply Memorandum of Law in Further Support of His Motion Pursuant to Federal Rule of Civil Procedure 26(a) and 56(d) and a "Declaration in Support of Plaintiff's Application for Stay of Its Opposition to Defendant David Hafer and Michael Cagel's Second Motion to Dismiss." In these documents, Thomas appears to be requesting that the Court deny or defer ruling on the Defendants' motions to dismiss until after it allows Plaintiff to conduct discovery. The Court declines Plaintiff's request as the Fifth Circuit Court of Appeals in *Carswell v. Camp*, 37 F.4th 1062, 1066 (2022), expressly held that a district court must rule on qualified immunity questions at the earliest stage and cannot "permit discovery against the immunity-asserting defendants before it rules on their defense."

In resolving the second prong—whether the right allegedly violated is "clearly established" —the contours of the right must be "clearly established" in a particularized sense to the context of the case, so that a reasonable official could be expected to understand that what he is doing violates that right.[17] *See Kinney*, 367 F.3d at 349-50 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "The touchstone of this inquiry is whether a reasonable person would have believed that his conduct conformed to the constitutional standard in light of the information available to him and the clearly established law."[18] *Goodson v. City of Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000). This Court finds instructive the enunciation of the second prong analysis in *Wernecke v. Garcia*:

> "The 'clearly established' standard does not mean that officials' conduct is protected by qualified immunity unless 'the very action in question has previously been held unlawful.'" [*Kinney*] at 350 (quoting *Anderson*, 483 U.S. at 640). "[W]hat 'clearly established' means . . . depends largely 'upon the level of generality at which the relevant "legal rule" is to be identified.'" *Wilson v. Layne*, 526 U.S. 603, 614(1999) (quoting *Anderson*, 483 U.S. at 639). "[A]n official does not lose qualified immunity merely because a certain right is clearly established in the abstract."[19] *Kinney*, 367 F.3d at 350. Officials should receive the protection of qualified immunity "unless the law is clear in the more particularized sense that reasonable officials should be 'on notice that their conduct is unlawful.'" *Id.* (quoting *Saucier*, 533 U.S. at 206). The court's focus, for purposes of the "clearly established" analysis, should be on "fair warning": qualified immunity is unavailable "despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Hope v. Pelzer*, 536 U.S. 730, 740 (2002).

---

[17] "This prong is comprised of two separate, but related, inquiries: "whether the allegedly violated constitutional rights were *clearly established at the time of the incident;* and, if so, whether the defendant's conduct was *objectively reasonable* in the light of that then clearly established law." *Backe v. City of Galveston, Tex.*, No. 10-CV-388, 2014 WL 794025, at *4 (S.D. Tex. Feb. 27, 2014).

[18] "Objective reasonableness is a matter of law for the Court to decide." *See Goodson*, 202 F.3d at 736.

[19] "A right may be clearly established without 'a case directly on point,' but 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Darden v. City of Fort Worth, Tex.*, 880 F.3d 772 (5th Cir. 2018) (quoting *Hanks v. Rogers*, 853 F.3d 738, 746-47 (5th Cir. 2017)).

*Wernecke v. Garcia*, 591 F.3d 386, 393 (5th Cir. 2009) (some internal citations omitted) (footnote added); *see White v. Pauly*, 137 S. Ct. 548, 551-52 (2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)); *see also City and Cty. of San Francisco v. Sheehan*, 575 U.S. 600, 611, n.3 (2015) (noting several of the Supreme Court's reversals on qualified immunity and collecting cases).

## A. Excessive Force

Thomas alleges a claim for against Defendants Cagel and Hafer for excessive force in violation of the Fourth Amendment.[20]   (*See* Pl.'s Compl. at 12.)   "[T]o state a violation of the Fourth Amendment prohibition on excessive force, the plaintiff must allege: (1) an injury that (2) resulted directly and only from the use of force that was excessive to the need, and (3) the use of force that was objectively unreasonable." *Bush v. Strain*, 513 F.3d 492, 500-01 (5th Cir. 2008); *see Linicomn v. Hill*, 902 F.3d 529, 539 (5th Cir. 2018).   "Claims of excessive force are fact-intensive; whether the force used was 'clearly excessive' and 'clearly unreasonable' depends on the 'facts and circumstances of each particular case.'" *Newman v. Guedry*, 703 F.3d 757, 761 (5th Cir. 2012) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).   Relevant considerations include the following: (1) the severity of the crime; (2) whether the suspect posed an immediate threat to the safety of the officer; and (3) whether the suspect was actively resisting or evading arrest. *Newman*, 703 F.3d at 761.   Although a showing of significant injury is not necessary, a plaintiff must show that he suffered some form of injury that is more than de minimis. *Mohamed for A.M. v. Irving Indep. Sch. Dist.*, 300 F. Supp. 3d 857, 891 (N.D. Tex. 2018).

---

[20] While Thomas also claims that his rights under the Fourteenth Amendment were also violated, "[t]he Supreme Court has made clear that 'all claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other seizure of a free citizen should be analyzed under the Fourth Amendment and its reasonableness standard . . . .'" *Grigsby v. Lawing*, 2017 WL 9806927, at *12 (E.D. Tex. Aug. 21, 2017) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)).

As to whether Thomas has alleged a constitutional violation for excessive force under the Fourth Amendment, it appears that only Defendant Hafer could potentially be liable for such a violation as he was the only officer sued by Thomas that allegedly had direct, physical contact with Thomas while Thomas was in the back of the police car and that allegedly sprayed Thomas with pepper spray. While Defendant Cagel told Defendant Hafer to spray Thomas if necessary, this Court has found no case that suggests that "the simple **threat** of the use of a pepper spray is a constitutional violation under any circumstances." *See White v. Greene Cty. Sheriff's Dept.*, No. 2:09-CV-211, 2014 WL 3058393, at \*5 (E.D. Tenn. July 7, 2014) (emphasis added). Consequently, the Court finds and concludes that Defendant Cagel is entitled to qualified immunity on the issue of excessive force.[21]

While it appears that Thomas has, at this point in the proceedings, sufficiently alleged that he suffered more than a de minimus injury from Defendant Hafer's actions, the issue is whether such injury resulted directly from the use of force that was excessive to the need and the use of force that was objectively unreasonable. Courts have "uniformly held that where a plaintiff is restrained, not resisting arrest, and is subsequently beaten, maced, Tased, etc. by police officers, such use of force is plainly excessive and not objectively reasonable." *Davis v. East Baton Rouge Parish Sheriff's Office*, No. 2010 WL 4962812, at \* 3 (M.D. La. Dec. 1, 2010) (collecting cases). However, Courts also "have consistently concluded that using pepper spray is reasonable . . . where the plaintiff was . . . *refusing police requests* . . . ." *Piper v. Preston*, No. 5-15-CV-00771-FB-RBF, 2018 WL 3193819, at \*6 (W.D. Tex. June 28, 2018). Moreover, one Court in this district

---

[21] Even assuming Defendant Cagel was somehow involved in actually spraying the pepper spray or mace or there is sufficient causal connection between Cagel's conduct as a supervisor and the alleged actions of Hafer, Cagel would be entitled to qualified immunity for the same reasons as Hafer, which are set forth herein.

has specifically found that the use of "a brief shot of pepper spray" on an arrested individual after such individual repeatedly refused to abide by orders to stop repeatedly kicking the inside of the police car did not violate that individual's constitutional right to be free from excessive force. *Lago-Planas v. Crocker*, No. 3:09-CV-2075-G-BK, 2011 WL 588053, at *4 (N.D. Tex. Jan. 19, 2011), *report and recommendation adopted*, 2011 WL 558719 (N.D. Tex. Feb. 9, 2011).

Liberally construing his pleading in the light most favorable to Thomas, the record contains no allegations in which a reasonable trier of fact could find that Defendant Hafer used excessive force or acted in an objectively unreasonable manner based on the facts alleged by Thomas. In this case, while Thomas was arrested and restrained in the back of the patrol car, Thomas has admitted that he would bang his head against the cage of the police car whenever Defendant Hafer and Officer Garcia tried to transport Thomas in an attempt to stop himself from being transported. According to Thomas's allegations, Defendant Hafer attempted to stop Thomas from engaging in this behavior by restraining Thomas' legs. When this did not help and Thomas continued to engage in such behavior even after hearing Defendant Cagel instruct Defendant Hafer to use pepper spray if Thomas did not stop such behavior, Defendant Hafer stopped the police car and sprayed Thomas in the face with pepper spray.

Under such circumstances, a reasonable officer in Defendant Hafer's position would have considered Thomas' actions, at a minimum, a threat to Thomas' own safety. Consequently, Defendant Hafer was justified in administering pepper spray or mace to stop Thomas' self harming behavior and force compliance with the officer's requests. As a result, the Court finds and concludes that Thomas has not alleged a violation of his constitutional right to be free from unreasonable seizure through excessive force and Defendant Hafer is entitled to judgment on the pleadings on the basis of qualified immunity.

14

## B. <u>Unlawful Arrest</u>[22]

Thomas also alleges a claim against Defendants Cagel and Hafer for unlawful arrest in violation of the Fourth Amendment. (Pl.'s Compl. at 14.) "An individual has a clearly established right to be free from unlawful arrest." *Davenport v. Rodriguez*, 147 F. Supp. 2d 630, 636 (S.D. Tex. 2001) (citing *Duckett v. City of Cedar Park*, 950 F.2d 272, 278 (5th Cir. 1992)). "An arrest may be unlawful it if it accomplished without due process of law as required by the United States Constitution." *White v. Harris Cty., Tex.*, No. H-07-2112, 2009 WL 911474, at *7 (S.D. Tex. Mar. 31, 2009). The "Fourth Amendment requires that an arrest be supported by a properly issued arrest warrant or probable cause." *Glenn v. City of Tyler*, 242 F.3d 307, 313 (5th Cir. 2001). "Where an arrest is made under authority of a properly issued warrant, the arrest is simply not a false arrest." *Maier v. Green*, 485 F. Supp. 2d 711, 718 (W.D. La. 2007). "Undisputed evidence that an arrest was effectuated under a facially valid arrest warrant satisfies the Fourth Amendment prerequisites and forecloses a § 1983 claim for false arrest." *Casanova v. City of* Brookshire, 119 F. Supp. 2d 639, 652 (S.D. Tex. 2000).

As set forth above, the first issue in considering a motion to dismiss on qualified immunity grounds is whether, taken in the light most favorable to Thomas, do the facts alleged show the officers' conduct violated a constitutional right. In this case, Thomas alleges that he was arrested for an out-of-state warrant for marijuana charges but that the arrest was unlawful because the officers knew that such warrant was not extraditable. (Pl.'s Compl. at 1-2, 7-8, 14-18.) Thomas

---

[22] In his Rule 7(a) Reply, Plaintiff, for the first time, attempts to raise a claim for "unlawful detention" at his initial encounter with Defendants. (*See* Pl.'s Rule 7(a) Reply at 14-16.) Because this is not the proper place to assert a new claim, the Court will not address it. *See Neal v. City of Fort Worth, Tex.* No. 4:07-CV-497-Y, 2009 WL 10705216, at *2 (stating that a Rule 7(a) reply is "not the proper vehicle for asserting a new claim"); *Ellis v. Crawford*, No. 3:03-CV-2416-D, 2007 WL 1624773, at *11 (N.D. Tex. June 6, 2007) ("The Rule 7(a) reply is not a proper vehicle for plaintiffs to raise a new cause of action that they have not been granted leave to add through an amended complaint.")

has not argued that the warrant was not based on probable cause or that it was faulty or improperly obtained. Consequently, probable cause existed for Defendants Cagel and Hafer to arrest Thomas and Thomas has, thus, failed to allege a violation of his constitutional right to be free from unlawful arrest. See, *e.g.*, *Harris v. Payne*, 254 F. App'x 410, 416 (2007).

Moreover, even assuming that Thomas has alleged a constitutional violation based on the allegation that Defendants knew the arrest warrant in Arkansas was a non-extraditable warrant, there is an absence of any controlling case that the Court can locate or that has been pointed out by Thomas showing that the law was so clearly established in August 2019 that a reasonable official could be expected to understand that what he is doing violated that right under the facts alleged by Thomas. While Thomas appears to argue that this a rare case where the constitutional violation is so patently obvious that it is unnecessary to identify judicial precedent to defeat qualified immunity, the Court disagrees. (*See* Pl.'s Rule 7(a) Reply at 7-9, 17-19.) Consequently, the Court finds and concludes that Defendants' Hafer and Cagel are entitled to qualified immunity on Thomas' claim for unlawful arrest.

### C. Retaliatory Arrest

Thomas also alleges a claim for retaliatory arrest against Defendants Cagel and Hafer in violation of the First Amendment. (Pl.'s Compl. at 18-20.) "[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions" for engaging in protected speech. *Hartman v. Moore*, 547 U.S. 250, 256 (2006). "A plaintiff alleging a First Amendment retaliation claim outside of the government employee context must show that (1) [he] was engaged in constitutionally protected activity; (2) the defendants' actions caused [him] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) the defendant's adverse actions were substantially motivated against

16

[his] exercise of constitutionally protected speech." *Cano*, 2018 WL 4567169, at *5; *see Miller v. Salvaggio*, No. SA-20-cv-00642-JKP, 2021 WL 3474006, at *5 (W.D. Tex. Aug. 6, 2021).  A "'First Amendment right to record the police does exist, subject only to reasonable time, place, and manner restrictions.'" *Chuttoo v. Horton*, No. 4:20-CV-211-SDJ, 2022 WL 4100807, at *13 (Sept. 7, 2022) (quoting *Turner v. Lt. Driver*, 848 F.3d 678, 688 (5th Cir. 2017)).  However, under the clearly established law prong of the qualified immunity analysis, there is generally not a First Amendment right to be free from retaliatory arrest that is supported by probable cause.  *See Nieves v. Bartlett*, 139 S. Ct. 1715, 1725 (2019); *Chuttoo*, 2022 WL 4100807, at *13 ("As the Supreme Court recently clarified, the presence of probable cause generally defeats a First Amendment retaliatory arrest claim."); *Miller*, 2021 WL 3474006, at *5 ("It is clearly established that an arrest or prosecution *unsupported by probable cause* that is made in retaliation for protected speech violates the First Amendment.").

Thomas alleges that Defendants Cagel and Hafer did not have probable cause that Thomas had committed a crime at the time they arrested Thomas on August 15, 2019 and that they arrested Thomas in retaliation for his prior acts of filming and protesting the mistreatment against the homeless living in downtown Fort Worth. (Pl.'s Compl. at 18-20.)  However, Thomas, as set forth above, does not dispute that he had an outstanding, valid warrant for his arrest issued in Arkansas. This arrest warrant provides probable cause for the arrest and Thomas does not meet his burden of showing that it was clearly established in August 2019 that he had a right to be free from an alleged "retaliatory arrest" when that arrest was supported by probable cause.  *See Woolum v. City of Dallas, Tex.*, No. 3:18-cv-2453-B-BN, 2020 WL 687614, at *11 (N.D. Tex. Jan. 22, 2020), report and recommendation adopted, 2020 WL 636903 (N.D. Tex. Feb. 11, 2020).  "The Supreme Court made clear in *Reichle v. Howards*, 566 U.S. 658 (2012), and again in *Lozman v. City of Riviera*

17

*Beach*, 138 S. Ct. 1945 (2018), that such a right is not clearly established." *Woolum*, 2020 WL 6887614, at *11 (quoting *Cano*, 2018 WL 4567169, at *6); *see Nieves*, 139 S. Ct. at 1725 (reiterating the general rule that a plaintiff must plead and prove the absence of probable cause for the underlying criminal charge in a retaliatory prosecution case). Consequently, Defendants Hafer and Cagel are entitled to qualified immunity with respect to Thomas' First Amendment claim for retaliatory arrest under the First amendment.[23]

---

[23] The Court notes that the Supreme Court, in *Nieves*, which was decided approximately two and a half months before Thomas' arrest, created a narrow exception to this general rule that a plaintiff cannot bring a retaliation claim if the police had probable cause to arrest. *Nieves*, 139 S. Ct. at 1727. The exception is that probable cause does not shield the officers from the retaliation claim "when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Nieves*, 139 S. Ct. at 1727; *see Gonzalez v. Trevino*, 42 F.4th 487, 492 (5th Cir. 2022). "The Court provided the example of jaywalking, which it notes 'is endemic but rarely results in arrest.'" *Gonzalez*, 42 F. 4th at 492. "It continued, '[i]f an individual who has been vocally complaining about police conduct is arrested for jaywalking,' the claim should not be dismissed despite the existence of probable cause because '[i]n such a case, . . . probable cause does little to prove or disprove the causal connection between animus and injury.'" *Gonzalez*, 42 F.4th at 492. "Such claims are properly understood as 'selective enforcement claims' under the Equal Protection Clause of the Fourteenth Amendment." *Henagan v. City of Lafayette*, No. 6:21-CV-03946, 2022 WL 4546721, at *13 (W.D. La. Aug. 16, 2022).

Thomas alleges that this exception applies, stating, "Additionally, there is objective evidence that Mr. Thomas was arrested when otherwise similarly situated individuals would not have been, as Cagel saw Thomas months later after the OC spray incident and asked Mr. Thomas why he was back in Ft. Worth, and how Cagel was going to take Thomas on another ride." (Pl.'s Compl. at 20.) However, the Court does not find that this allegation meets the exception to the general rule as Thomas has made no allegation that *other* similarly situated persons with an outstanding arrest warrant, not engaged in some sort of protected speech, were not arrested. Consequently, the exception set forth in *Nieves* is not applicable. *See Gonzalez*, 42 F.4th at 492 ("[Plaintiff] cannot take advantage of the *Nieves* exception because she has failed to 'present[ ] objective evidence that [s]he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been.'").

### D. **Deliberate Indifference**

Thomas also alleges a claim against Defendants Cagel and Hafer for deliberate indifference in violation of the Fourteenth Amendment. (Pl.'s Compl. at 20-23.) "The Fourteenth Amendment guarantees pretrial detainees a right 'to not have their serious medical needs met with deliberate indifference on the part of the confining officials.'" *Dyer v. Houston*, 964 F.3d 374, 380 (5th Cir. 2020) (quoting *Thompson v. Upshur Cty., Tex.*, 245 F.3d 447, 457 (5th Cir. 2001). "To succeed on a deliberate-indifference claim, plaintiffs must show that (1) the official was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and (2) the official actually drew that inference." *Dyer*, 964 F.3d at 380 (internal quotations omitted). "Deliberate indifference is an extremely high standard to meet." *Dyer*, 964 F.3d at 380 (internal quotations omitted). "[D]eliberate indifference cannot be inferred merely from a negligent or even a grossly negligent response to a substantial risk of serious harm." *Dyer*, 964 F.3d at 381 (internal quotations omitted).

The first issue is what allegations for deliberate indifference can be attributed to Defendants Cagel and Hafer. While Thomas makes allegations of mistreatment extending from the time he was detained and arrested by the Defendants to the time he was released from jail, Thomas only alleges that Defendants Cagel and Hafer were present from the time Thomas was detained and arrested to the time he was transported to the county jail. There is no indication or allegations that Defendants were present from the time Thomas was booked into the county jail until his subsequent release approximately three days later. Thus, the allegations relating to Thomas' treatment while at the county jail (*i.e.*, placed in mental health segregation, not provided a shower for three days, and not seen by medical) cannot be attributed to a failure of Defendants to act as they were not present during this time period.

19

As to whether Defendants are entitled to qualified immunity, the first issue, as set forth above, is whether Thomas has alleged a constitutional violation of his right under the Fourteenth Amendment to be free from deliberate indifference. The Court concludes that Thomas has not. Based on the facts alleged by Thomas, Defendants[24] performed CPR on Thomas after he suffered some sort of asthmatic event after being shot in the face with pepper spray and took Thomas to a nearby hospital for treatment, where he was evaluated by nurses and medics and given a towel to wipe off his face. (*See* Pl.'s Compl. at 3-4, 9, 22-23; Pl.'s Answers to Quest. at 6.) Then, the Defendants transported Thomas to the county jail, where he was transferred into the custody of other individuals. While Thomas claims that the Defendants, in essence, lied to the hospital personnel to lighten the severity of Thomas' injuries, Thomas admits that the Defendants told the medics and the nurses at the hospital that Thomas had been sprayed and CPR was administered. (Pl.'s Compl. at 22-23.) Even assuming the alleged facts are true and viewed in the light most favorable to Thomas, Thomas has not alleged facts indicating Defendants acted with deliberate indifference to his serious medical needs as Defendants immediately took him to the hospital after administering CPR and, at the very least, informed the hospital that they had performed at least one chest compression after spraying Thomas with pepper spray or mace. *See, e.g., Wagner v. Bay City, Tex.*, 227 F.3d 316 (5th Cir. 2000) (stating that decontamination from the effects of pepper spray "could occur in any number of places, including the jail, the hospital, or even on the

---

[24] It is unclear whether Defendant Cagel was still with Thomas from the time Thomas was pepper sprayed until he was transported to the county jail. Consequently, because Thomas' allegations do not focus specifically on the conduct of Defendant Cagel, Defendant Cagel is entitled to qualified immunity on this claim. *See Linicomn v. Hill*, 902 F.3d 529, 540 (5th Cir. 2018); *Reyes v. Sazan*, 168 F.3d 158, 161 (5th Cir. 1999) (stating that, in qualified immunity cases, the purpose of a Rule 7(a) reply is to require a plaintiff to allege facts that focus specifically on the conduct of the individual or individuals who caused the plaintiff's injury). However, in an attempt to liberally construe the pleadings in the light most favorable to Thomas, who is proceeding *pro se*, the Court will assume that Defendant Cagel was present during this time.

scene"). Thus, the Court finds and concludes that Thomas has not alleged a constitutional violation for deliberate indifference pursuant to the Fourteenth Amendment, and, consequently, Defendants are entitled to qualified immunity on this issue.

## RECOMMENDATION

Based on the foregoing, it is **RECOMMENDED** that Defendant Hafer's Second Motion and Brief to Dismiss [doc. 31] and Defendant Cagel's Motion to Dismiss under Rule 12(c) [doc. 32] be **GRANTED** and all claims against them be **DISMISSED**.

## NOTICE OF RIGHT TO OBJECT TO PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATION AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within fourteen (14) days after the party has been served with a copy of this document. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file, by the date stated above, a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1) (extending time to file objections from ten to fourteen days).

## ORDER

Under 28 U.S.C. § 636, it is hereby **ORDERED** that each party is granted **until October 31, 2022** to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation. It is further **ORDERED** that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further **ORDERED** that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED October 17, 2022.

JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE